**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| DIALIGHT PLC,<br><br>Plaintiff,<br><br>vs.<br><br>SANMINA CORPORATION,<br><br>Defendant. | : | Case No.:<br><br>**COMPLAINT** |

Plaintiff Dialight PLC ("Dialight"), by and through its undersigned attorneys, alleges as follows for its Complaint against Defendant Sanmina Corporation ("Sanmina"):

## <u>NATURE OF THE ACTION</u>

1. Dialight brings this action to seek redress for the fraudulent and willful misconduct, gross negligence, and contractual breaches of Dialight's former manufacturing partner, Sanmina. On March 8, 2016, Dialight signed a Manufacturing Services Agreement ("MSA") with Sanmina for the production of LED fixtures. Sanmina induced Dialight to enter into this agreement by making material misstatements about its then-existing capabilities and expertise, including with respect to its stated expertise in complex low-volume high-mix manufacturing, which Dialight relied upon. It has now become clear that these statements were false at the time they were made, and the falsities were peculiarly within Sanmina's knowledge. Dialight expressly relied upon Sanmina's statements as its basis for entering into the agreement, and Dialight has suffered significant harm as a result.

2. Following the execution of the MSA, Sanmina acted in a willful and/or grossly negligent manner in regard to its obligations under the MSA. Sanmina regularly demonstrated

that it lacked the ability to meet Dialight's stated needs and, worse, had no interest in developing that ability. Sanmina refused to properly train its employees, modify its processes and systems to meet Dialight's specific needs (for example, in relation to materials requirements planning), or take steps to improve its performance. The result was an ongoing failure to meet agreed-upon production output targets, resulting in late product deliveries and lost orders. And even when product was delivered on time, it was often plagued by workmanship quality issues.

3. In fact, by June of 2018, Sanmina's then CEO (Bob Eulau) had no choice but to admit that he was "disappointed in [Sanmina's] results . . . . I know Sanmina can do better for you. We are making progress but not fast enough for either company." Sanmina's managers on the ground in Guadalajara (responsible for delivery of the manufacturing services to Dialight from the two Sanmina plants in Guadalajara), Jorge Rios and Manuel Chavez, conceded to Dialight senior managers that Sanmina had no experience in the type of complex low-volume high-mix manufacturing required by Dialight, which Sanmina previously represented that it possessed as an inducement for Dialight to enter into the MSA.

4. Sanmina's willful misconduct and gross negligence in refusing to honor its contractual obligations directly caused Dialight to incur substantial remedial costs, to lose customers, and to lose profits. Sanmina's failure to meet delivery dates, failure to manage the supply chain, and failure to implement quality control measures all constituted willful or grossly negligent breaches of the MSA, and were documented contemporaneously by Dialight and reflected in its regulatory filings as a publicly listed company.

5. Indeed, the effect on Dialight's business was so pronounced that it severely eroded its market capitalization value. All told, the damages incurred by Dialight exceed $250 million.

## THE PARTIES

6. Dialight is a public limited company that was founded in the United States in 1938 and maintains its U.S. headquarters in New Jersey. Dialight is a global leader in industrial light emitting diode ("LED") technology, with over 1.8 million fixtures installed worldwide. Dialight's products can be used by customers for nearly any industrial or commercial setting. Dialight focuses on providing lighting solutions for hazardous environments, including liquefied natural gas (LNG) plants, oil refineries, and high-risk manufacturing environments worldwide, where the specification is extremely demanding and the build quality must strictly comply. Dialight's products provide one of the most efficient ways to drive down energy usage and enhance workplace and public safety. Dialight is organized under the laws of the United Kingdom and its global headquarters are in London.

7. Sanmina Corporation ("Sanmina") is a publically traded Delaware corporation with headquarters in San Jose, California.

## JURISDICTION AND VENUE

8. The Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the action is between a citizen of the United States and citizens or subjects of a foreign state, and the amount in controversy exceeds $75,000.

9. The Court has personal jurisdiction over Sanmina because Sanmina has consented to jurisdiction in New York.

10. Venue is appropriate in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District and because Sanmina and Dialight have consented to venue herein. (MSA ¶ 25.10).

## BACKGROUND

### A. Dialight Searched for a Manufacturing Partner in 2015.

11. Dialight PLC is a world leader in the design, production and implementation of industrial and commercial LED lighting solutions.

12. In 2015, Dialight maintained in-house production facilities in Ensenada, Mexico ("Ensenada"), Roxboro, North Carolina ("Roxboro"), and Newmarket, United Kingdom ("Newmarket"). From these facilities, Dialight handled all aspects of its "high mix / low volume" lighting production process (described *infra* in ¶ 19), from painting to final assembly.

13. At that time, Dialight began looking for a manufacturing partner so that it could efficiently meet the growing appetite for Dialight products and expand its business globally while also reliably servicing its customers' needs. Once a partner assumed production and supply-chain management on Dialight's behalf, Dialight intended to scale down its in-house production and focus its internal efforts on product development and revenue generation.

### B. Sanmina Fraudulently Induced Dialight to Enter into the MSA.

14. By early 2016, Dialight thought it had identified a solution for its growing needs in Sanmina, which held itself out as an expert contract manufacturer specializing in the high-mix low volume production of advanced optical and complex technological products.

15. From the outset of its negotiations with Sanmina, Dialight made its expectations and intentions clear: Dialight wanted a manufacturing partner to which it could fully transition its supply chain, manufacturing, testing, assembly, and packaging of high-specification LED products and components. Dialight consistently stressed that it needed a partner who could handle Dialight's peculiar workflow and "high-mix, low-volume" process, and that it would not outsource unless it found a partner who could reliably work in accord with Dialight's needs. Dialight even told Sanmina that it would be closing two of its manufacturing facilities—one in Mexico, and one

in the United Kingdom—in reliance on Sanmina's representations that it would be able to take over the entirety of Dialight's production and supply-chain management operations. Extensive work was carried out by Sanmina in reviewing Dialight's specific manufacturing requirements (including site visits) and in building its proposal documentation.

16. In order to induce Dialight to sign the MSA, Sanmina specifically represented that it had the existing ability to provide, from a single facility, complete manufacturing and vertical integration capabilities and represented that it was an expert in the contract manufacturing field for LED products and components, and would be able to adapt its internal processes and systems to meet Dialight's specific needs (such as, for instance, Dialight's complicated materials requirements planning ("MRP") needs).

17. Sanmina's Senior Vice President for Business Development Mike Giggey (who was the principal Sanmina sponsor of the MSA and who signed it on behalf of Sanmina), repeatedly confirmed to Dialight on behalf of Sanmina that Sanmina already had the capacity and expertise necessary to handle Dialight's particular needs at Sanmina Plant 2, located within the city of Guadalajara in Jalisco, Mexico ("Guadalajara").

18. Predicated on Sanmina's assurances that it had the necessary expertise in place, the parties executed the MSA on March 8, 2016, attached hereto as Exhibit A. As the second Recital to the Agreement expressly states, Sanmina represented that it is "an expert in the contract manufacturing field for LED products and components." Dialight relied on this representation as a basis for entering into the Agreement.

19. The basic assumptions of this agreement—the twin pillars on which Sanmina built its bid for Dialight's business—are set forth on the very first page. As the third Recital to the agreement explains, the fixtures that Dialight provides to customers "share common sub-

assemblies that may be manufactured and held in work-in-process locations until required for final configuration into a Finished product"—in other words, the end-product that Dialight sells to a given customer is a unique amalgamation of LED sub-components, each of which must be separately manufactured and then integrated as necessary into a customized final product. This type of production model is often referred to as "high mix/low volume," and it requires Dialight or its partner to manufacture, and to at all times have available, each of the many possible sub-components that might go into a final product, so as to significantly expedite the assembly of that final product once an order for that product is received. This process also requires a high degree of manufacturing and supply chain capability and expertise.

20. The Recital in the MSA makes plain that "Sanmina's expressed capability to provide this manufacturing flexibility is one determining factor in the selection of Sanmina by Dialight as the manufacturer of the Products."

21. The second, closely related factor was Sanmina's stated ability "to provide from a single profit center complete vertical integration capabilities, including sheet metal fabrication, machining, printed circuit board assembly, paint line, and final Product assembly operations"—e.g., a single facility from which all completed fixtures and their component parts could be manufactured and tracked.

22. In other words, Sanmina promised that it had the then-existing capability to meet Dialight's unique needs. Dialight would not have agreed to contract with Sanmina absent that representation, as is plain from the face of the MSA itself.

23. This representation was false, and Sanmina knew that it was false at the time it was made. Sanmina lacked the capability to meet the demands of Dialight's process and customers. This information was peculiarly within Sanmina's knowledge at the time these representations

were made, and Dialight reasonably relied on Sanmina's representations regarding its then-existing capabilities.

### C. <u>The MSA Required Sanmina to Satisfy Specific Production Requirements.</u>

24. The MSA contained numerous contractual provisions requiring Sanmina to satisfy basic levels of service:

25. Section 3.3 of the MSA required Sanmina to employ "commercially reasonable efforts to deliver the Products on the agreed-upon delivery dates."

26. Section 3.4 of the MSA required Sanmina to achieve an on-time delivery rate of 95% or better.

27. Section 2.4 of the MSA required Sanmina to "use all reasonable endeavours to expedite the manufacture, assembly and delivery of the applicable Products" produced under the MSA when it expected that it would not be able to timely deliver finished products.

28. Section 4.1 of the MSA required Sanmina to "perform all services necessary to deliver to Dialight the Products identified in Orders identified in this Agreement and/or as otherwise agreed in writing by the Parties."

29. Section 4.4 of the MSA required Sanmina to "use commercially reasonable efforts to notify Dialight well in advance (but as soon as is reasonably practicable) of Materials lead time changes and possible shortages of Materials that may adversely affect Sanmina's ability to meet Product quantities and shipment dates of Orders or Forecast."

30. Section 4.8 of the MSA required Sanmina to "notify Dialight in a timely manner if Materials are in short supply or if Sanmina's manufacturing capacity will be insufficient to meet all Dialight's Product requirements in the time frames required by Dialight's Orders. Such notice

will include the expected duration of the shortage or constrained capacity and its impact on the Forecast. The parties shall work together to mitigate such constrained allocation events."

**D. <u>Sanmina Acted with Gross Negligence and Repeatedly Breached the MSA.</u>**

31. Soon after the MSA went into effect, Sanmina began demonstrating that it could not meet Dialight's stated needs and that its ability to do so would not improve. Sanmina regularly failed to meet agreed-upon production output targets. Late product deliveries and lost orders became the norm. Sanmina's products also suffered from significant workmanship quality issues, even when they were delivered on time.

32. When these issues first became apparent, and over the term of the MSA, Dialight attempted to proactively address them with Sanmina. This included sending a supply chain management team to Sanmina to assist it in correcting the myriad issues preventing Sanmina from meeting the terms and conditions of the contract. But rather than working with the Dialight team, Sanmina repeatedly refused to co-operate and, at times, withheld information needed to understand, analyze and fix the existing problems.

33. To assess the extent of Sanmina's problems, Dialight requested that Sanmina grant their staff access to Guadalajara in order to troubleshoot the manufacturing workflow. Considerable Dialight resources (including supply chain, engineering, customer services, finance, logistics, IT and quality assurance experts) were directed at 'on the ground' root-cause analysis of quality issues and production failings. Dialight had resources with extensive experience of high-mix low-volume manufacturing (as evidenced by the fact that once Dialight had returned manufacturing in-house, it was relatively quickly able to meet quality and production targets) who were able to identify an extensive range of potential rectifications that would have assisted Sanmina in meeting its contractual obligations. This information was brought to the attention of the relevant Sanmina managers including Jorge Rios, Jorge Camacho, Ruben Munoz and Bob

Green. However, Sanmina actively chose to ignore that advice – they were, or should have been aware, of how to cure their breach, but decided not to act upon it. Dialight's recommendations to Sanmina were ignored notwithstanding the collaborative working obligations of the parties required under the MSA.

34. Sanmina refused to modify its processes to meet the promised output levels and delivery times. In fact, Sanmina willfully undermined and stonewalled Dialight's attempts to ameliorate the situation, and persisted in maintaining the same deficient processes.

35. Sanmina never made any meaningful progress in improving its on-time delivery ("OTD") rate to the threshold rate of 95% as promised in the MSA.

36. Specifically, by the start of 2017, the lack of on-time performance at Guadalajara reached a tipping point. In January of that year, Sanmina delivered a majority of products due under the MSA only after substantial delay.

37. At the end of May 2017, Sanmina's late deliveries continued.

38. With no reasonable way to change the supply chain management, material requirements planning, manufacturing and quality assurance processes at Sanmina's Guadalajara plant to meet Dialight's urgent needs, no reasonable prospects of bringing Sanmina's facility up to its promised efficiency, and no end in sight to Sanmina's lackadaisical response to Dialight's concerns, Dialight was forced to mitigate its losses as it explored solutions to the Sanmina problem.

39. As an initial, substantial step, Dialight brought production of several product lines back in-house to its facility in Ensenada and into a new facility in Penang, Malaysia ("Penang"), and retained capacity at Roxboro, though Dialight continued to purchase components and sub-assemblies from Sanmina. (Dialight's facility in the United Kingdom, Newmarket, had already been entirely closed in reliance on Sanmina's representations.) Although it paid a hefty transition

cost, Dialight quickly ramped up production in Ensenada such that orders for its largest product line, “Highbay”, were brought back to a normal schedule by the end of September 2017 – i.e. by insourcing production, Dialight had relatively little trouble in meeting the quality and delivery requirements that Sanmina had been unable to achieve.

40. Yet, despite Dialight’s removal of product lines from Guadalajara, including the more complex products, Sanmina’s performance during that same time remained listless – and, in several cases, seriously degraded. Delays on Dialight product lines remaining in Guadalajara continued, even though Guadalajara was charged with producing far fewer products overall than it had when it was responsible for the Highbay line. There were two distinct problems here: (i) Sanmina’s inability to manufacture low-volume high-mix product to an acceptable standard (specific to Dialight, though not uniquely specific); and (ii) Sanmina’s inability to manufacture subassemblies to an acceptable standard and manage its inventory and supply chain (a more generalized failing, albeit for a more complex component mix).

41. Most concerning to Dialight through the term of the MSA was Sanmina’s inability to accurately predict its own production levels. In September 2017 Dialight forecast a potential $36M of orders for products to be shipped by December 2017 and Sanmina provided assurances as to its forecast level of fulfillment. In reality, Sanmina managed to deliver just $15M of orders across this period to 31 December 2017 – ending the year with an on-time delivery rate of just around 45% and with a total ‘past due’ backlog of orders for approximately 8000 items.

42. As a result of this poor performance, and Sanmina’s complete indifference to performing in accord with the MSA, Dialight needed to attempt direct intervention in Sanmina’s process.

43. By February 2018, Dialight had fully seconded 5–7 full-time support personnel to Guadalajara, in order to assess Sanmina's problems and attempt to solve the ongoing problems at Sanmina Plant 2. In doing so, Dialight was forced to spend over $125,000 per month in additional travel fees, expenses, and lost opportunities from the salaried employees that were seconded to Gaudalajara. By this time, Dialight's facilities in the United Kingdom had been closed down – Dialight had relied upon Sanmina's representations as to manufacturing competence – and it had no alternative but to try and make the relationship work.

44. In early 2018, representatives from Dialight met with Sanmina senior management – Chief Business Officer Gerry Fey, Mike Giggey, and Chief Operations Officer of the Assembly Division Americas Marco Gonzalez – at Sanmina's headquarters in San Jose, California. At this meeting, Dialight openly and forcefully reiterated its concerns, not only with regard to Sanmina's underlying performance but also with regard to Sanmina's continued indifference to rectifying the situation.

45. Dialight clearly set out the extent of the "crisis" impacting Dialight and all three of the senior attendees from Sanmina would have been fully aware of the extent of Sanmina's failings at the time and of the harm being caused to Dialight. None of this was a surprise to Sanmina, and Sanmina was afforded very opportunity to rectify the problem. Although Sanmina expressed sympathy for Dialight at this meeting, they took no concrete action to address Dialight's reasonable concerns or to improve their crisis-level performance in Guadalajara.

46. The crisis in Guadalajara continued – and deepened – over the remainder of the Sanmina-Dialight relationship. Sanmina's systems routinely produced unreasonably protracted lead times – often eight months or more from the date of order – and yet Sanmina did nothing to bring these lead times down to the levels that Dialight and her customers required.

47. Even when Sanmina did manage to deliver product there were frequent and material quality issues that resulted in rejection of a significant percentage of Sanmina deliveries and even greater delays in meeting customer orders. These issues were detected by Dialight's quality inspection processes and impacted every single part of the manufacturing process at which Sanmina professed to be an expert.

48. If Dialight had shipped direct from Sanmina to customers (i.e. had not implemented its own processes to detect these quality issues) not only would there have been much greater harm caused to Dialight's customer base (through installation of defective products and subsequent failure, delayed delivery, etc.) but potentially dangerous product would have been installed across Dialight's customer base with potentially catastrophic impact in high-risk industrial settings. These quality issues became so problematic that Dialight requested the implementation of a quality inspection 'firewall' by Sanmina with 100% inspections of all items shipped. Notwithstanding this, rejection rates by Dialight based upon its own quality inspection (upon receipt of items) remained high.

49. The catalogue of errors by Sanmina included specific instances (amongst others) of: (a) failures in basic quality management by Sanmina resulting in defective product being delivered that should have been identified in the quality inspection process; (b) failures in production of manufacturing assembly documentation (for instance, an absence of basic tools for validating bill of materials for assembly); (c) basic manufacturing errors (with stock delivered, for example, with severed internal wiring, batteries missing, the wrong color lights, use of wrong components, missing earth cables, missing gaskets, missing light lenses); (d) incorrect set-up of assembly process stations (resulting in the wrong component stock being used and/or components being damaged during assembly); (e) mixing of legacy and platform components (with potential

impact on product integrity, failure rates and warranty issues); (f) missing structural components (resulting in, for instance, water ingress into sealed units); and (g) failure of automated assembly processes not being detected and resulting in defective product.

50. Sanmina consistently struggled to deliver goods that met specification, were fit for purpose, were safe, and were not rejected. By May 2018 Sanmina managed to achieve a staggeringly low 33.22% acceptance rate for goods, components, and sub-assemblies shipped to Dialight (i.e. the rejection of 2 in every 3 goods items shipped). By summer 2018 the damage was done and Dialight simply could not trust Sanmina to supply consistently usable components and sub-assemblies and to make consistently safe and saleable product. Sanmina's then CEO (Bob Eulau) admitted in June 2018 that he was "disappointed in [Sanmina's] results . . . . I know Sanmina can do better for you. We are making progress but not fast enough for either company."

51. By way of further example, in August 2018 Dialight informed Sanmina that it had lost a large order from, and the relationship with, a long-standing customer as a direct result of Sanmina's poor production performance. The response of a senior Sanmina executive was to comment that he was "sorry about that … any chance to re-engage? … can I go … to beg for forgiveness … we are making changes …". This was at a time when Sanmina was barely managing to ship 50% of orders to its on-time delivery mandate and where total product past its delivery date had reached approximately 13,000 units.

### E. <u>Dialight Was Forced to Terminate the MSA</u>

52. By summer of 2018, the manufacturing relationship between Dialight and Sanmina was unsalvageable. Dialight simply could not trust Sanmina to supply consistently usable components and sub-assemblies, much less consistently safe and saleable final products. Dialight tendered its termination notice to Sanmina on September 27, 2018.

### F. <u>Sanmina Has Exhibited Additional Incompetence Post-Termination</u>

53. Dialight, in good faith, worked diligently to wind down the relationship after termination. Yet this wind-down process revealed significant further concerns.

54. Dialight's concerns extended to the maintenance by Sanmina of its inventory and the quality checking of such inventory prior to use in the manufacturing process. Between January and September 2019, when Dialight was endeavoring to assist Sanmina in utilizing inventory built up and held by Sanmina, Dialight recorded approximately 40 instances of rejection of specific items of component parts delivered out of stock by Sanmina to Dialight. Over these 40 instances, Dialight checked roughly 24,000 individual pieces for quality, of which approximately 14,000 (58%) were rejected. Issues included wrongly labelled parts, wrong parts, defective parts, and date-expired materials.

55. Yet again Dialight incurred additional direct costs in order to gain assurance over the quality and appropriateness of component parts supplied by Sanmina.

### G. <u>Dialight Has Uncovered an Epidemic Defect in Products Produced by Sanmina</u>.

56. Sanmina's failures under the MSA did not only affect Dialight's customers, market-place reputation, employees, profitability, balance sheet, and market valuation; Sanmina's ineptitude has also has had a major impact on product quality and safety.

57. By way of example, Sanmina's production of safety lanyards is illustrative. Dialight's lighting fixtures can be heavy, and are used in a variety of high-risk industrial settings. As a result, safety is paramount. To ensure safe installation, many of Dialight's products come with anchor points for attaching safety lanyards – loops of high tensile-strength stainless-steel cable, sealed by a sleeve crimped onto the ends, that are to be connected to a secondary, back-up anchor point when the fixture is installed. In the event that a fixture's main anchor point fails for

whatever reason, the lanyard catches the lighting fixture and prevents it from falling to the ground and potentially injuring those below.

58. Manufacture of these lanyards is the simplest manufacturing process for any Dialight product, involving only three components and two manufacturing steps. The worker's task is simple; produce two crimped loops at either end of a length of stainless-steel wire. Adherence to the specified methodology of crimping is critical to product functionality and safety. If the crimp is not made, or is incorrectly made, then the crimp could fail at a breaking strain below that of the constituent stainless-steel wire, rendering the product inoperative and potentially hazardous.

59. Approximately 32% of the Sanmina-produced lanyards tested (equating to 1006 of the total of 3083 units manufactured by Sanmina) failed such testing at the appropriate breaking strain, with a number failing a simple hand-pull test.

60. Put simply, these products should never have been shipped by Sanmina. The failure-rate of these critical safety items speaks volumes about the level of care, professionalism and manufacturing competency exercised by Sanmina in performing its obligations under the MSA.

61. Pursuant to its obligations under MSA ¶ 23.8, Dialight notified Sanmina on October 4th, 2019, that a substantial portion of the lanyards Sanmina had produced under model numbers H6XCAB72, HZXCBL2, HBXCAB48, HZXSAFECBLS, and LTXSAFEKIT had been manufactured with deficient workmanship.

62. On October 14, 2019, Sanmina responded to Dialight's notice. In their response, Sanmina claimed that it had produced the lanyards following Dialight's specifications. In

particular, it asserted that it had used a substantially comparable crimping tool to that required by Dialight – this one from Tyler Tools.

63. Dialight's own, independent testing, as well as documentation produced by Sanmina, shows that Sanmina's claim is demonstrably false and necessarily a further attempt to deceive Dialight. The testing and documents reflect that Sanmina has used nothing more than a set of small, hand-operated vise-grips – a tool completely inappropriate for the task and obviously at odds with Dialight's own specifications.

### H. Sanmina's Misconduct Has Caused Significant Harm to Dialight.

64. Dialight has suffered significant harm as a result of Sanmina's misconduct. Dialight preliminarily estimates that its total damages attributable to Sanmina's misconduct exceed $250 million. Those damages fall into the following categories:

a. $3.5 million to $9 million in direct mitigation and other out-of-pocket expenses. Sanmina's failure to perform its contractual duties forced Dialight to incur substantial expenses including travel and freight expenses in an effort to mitigate the damage caused by Sanmina and costs associated with defective products, quality assurance, goods-in checking and the like. Dialight's management was also forced to spend significant, uncompensated time in an ultimately futile effort to help Sanmina improve its performance.

b. Approximately $10 million to $13 million in direct mitigation expenses incurred during the process of transferring manufacturing back in-house. Dialight was forced to maintain dual-supplier structures and increased inventory in order to mitigate the contractual breaches by Sanmina and ensure continuity of supply for customers by restoring manufacturing performance back to the pre-outsourcing

levels. The approximate quantum of these losses is already in the public domain as a result of Dialight's public listed status and subject to independent scrutiny.

c. $25 million to $50 million in lost profits from existing orders. Dialight lost millions in profits when customers canceled their orders in response to delayed delivery dates.

d. $25 million to $50 million in lost profits from future orders and loss of goodwill. Dialight lost millions in future orders that were never made and lost customer relationships that it had spent years developing.

e. $200 million to $300 million in diminished market capitalization value. Sanmina's utter failure to competently take over manufacturing for Dialight nearly crippled Dialight's business, causing its share price to plummet over the life of the contract. Dialight will be able to demonstrate with reasonable certainty that this reduction was caused by Sanmina's actions or inactions.

f. Additional reasonably calculable mitigation costs associated with the epidemic defect in Sanmina-made product and the additional quality control required for Sanmina-held inventory.

65. In addition to the above-mentioned damages, Sanmina continues to hold approximately $5.3 million of Dialight's funds in an escrow fund established to cover inventory liability, which it has retained without any lawful basis under the MSA.

66. Notwithstanding any of the above, Sanmina has refused to acknowledge any liability for the damage it caused to Dialight. Sanmina is likely trusting in the terms of the MSA, which it drafted, and which purports to cap Sanmina's liability at an amount well below Dialight's

actual damages. It is hornbook law in New York, however, that a party's gross negligence, willful misconduct, or fraud vitiates such caps—and in this case, Sanmina is guilty of all three.

## CLAIMS FOR RELIEF

### First Claim for Relief
### (Fraudulent inducement)

67. Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

68. Sanmina fraudulently induced Dialight to sign the MSA and entrust its manufacturing processes to Sanmina by falsely representing that it already possessed the necessary experience and capacity to satisfy the demands of Dialight's "high mix/low volume" production model.

69. Dialight reasonably relied on this representation, and Sanmina intended for Dialight to do so: Sanmina assured Dialight that it was already equipped to handle this complexity and was, in fact, an expert in such processes.

70. The MSA explicitly recognizes that "Sanmina's expressed capability to provide…manufacturing flexibility" was one "determining factor in the selection of Sanmina by Dialight as the manufacturer".

71. Although Sanmina clearly intended for Dialight to rely upon these statements regarding existing facts, Sanmina knew they were false at the time they were made.

72. The false information was peculiarly within Sanmina's control, and Dialight reasonably relied on the false representations made by Sanmina regarding its purportedly then-existing expertise and capabilities.

73. Sanmina's knew full well that its existing capabilities were incompatible with a "high mix/low volume" manufacturing business despite deliberately claiming otherwise to Dialight.

74. Sanmina's fraudulent misrepresentations directly injured Dialight by causing it to entrust the manufacture of its products to a company that was not equipped to do the job. As a result, Dialight incurred substantial costs attempting to compensate for Sanmina's deficient performance and lost profits from existing and future orders of unsatisfied customers. These losses also led to the devaluation of Dialight's market capitalization.

**Second Claim for Relief**
**(Breach of Contract)**

75. Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

76. Dialight performed its own obligations under the MSA.

77. Sanmina, from shortly after performance began in March 2016 until Dialight was forced to terminate the agreement in September 2018, repeatedly failed to perform its obligations under the contract in a willful – or at best, grossly negligent – manner.

78. Amongst other breaches, Sanmina violated Section 1.2 of the MSA by failing to manufacture Finished Products[1] that conform to specifications pursuant to purchase orders.

79. Sanmina violated Section 2.4 of the MSA by failing to "use all reasonable endeavours to expedite the manufacture, assembly and delivery of the applicable Products" produced under the MSA when it expected that it would not be able to timely deliver finished products.

[1] All capitalized terms have the meaning ascribed to them in the MSA.

80. Sanmina violated Section 3.1 of the MSA by failing to ship Finished Products conforming to specifications in accordance with the orders they received.

81. Sanmina violated Section 3.3 of the MSA by failing to employ "commercially reasonable efforts to deliver the Products on the agreed-upon delivery dates."

82. Sanmina violated Section 3.4 of the MSA by failing to fulfill its promise of achieving an on-time delivery rate of 95% and by otherwise failing to timely deliver product.

83. Sanmina violated Section 3.5 of the MSA by failing to ship all orders complete.

84. Sanmina violated Sections 3.7 and 3.8 of the MSA by failing to comply with the rejection process set forth in these provisions of the MSA.

85. Sanmina violated Section 4.1 of the MSA by failing to perform all services necessary to deliver to Diaight the Products as required.

86. Sanmina violated Section 4.4 of the MSA by failing to use commercially reasonable efforts to notify Dialight well in advance and as soon as is reasonably practicable of Materials lead-time changes and possible shortages of Materials that could adversely affect Sanmina's ability to meet Product quantities and shipment dates of Orders or Forecast.

87. Sanmina violated Section 4.5 of the MSA by failing to update Product quantities in its Materials Requirement Planning ("MRP") system at least weekly, and by its procurement personnel failure to take prompt action in response to MRP system-generated messages for corrective actions.

88. Sanmina violated Section 4.8 of the MSA by failing to notify Dialight in a timely manner that Materials were in short supply and that Sanmina's manufacturing capacity was insufficient to meet Dialight's product requirements in the timeframes required by Dialight's orders.

89. Sanmina violated Section 7.3 of the MSA by failing to use commercially reasonable efforts to attempt to mitigate the costs described in Section 7.2 of the MSA.

90. Sanmina violated Section 8.5 of the MSA by failing to undertake commercially reasonable efforts to minimize costs for excess and obsolete materials.

91. Sanmina violated Section 8.6 of the MSA by failing to make the refund payments required by this provision.

92. Sanmina violated Section 14.1 of the MSA by failing to manufacture Product in accordance with Product Specifications.

93. Sanmina violated Section 23.8 of the MSA by failing to comply with its obligations with respect to Epidemic Defects found in its manufactured products.

94. Sanmina's then-CEO admitted responsibility for these failures in correspondence with Dialight. The cause of those failures was Sanmina's willful misconduct and the gross negligence with which it violated its duties under the MSA, including by affirmatively taking steps to conceal the extent of its dysfunction from Dialight and to prevent Dialight from taking appropriate corrective action. Sanmina to date has not challenged Dialight's termination of the MSA on the basis of material breach.

95. Sanmina repeatedly and wantonly ignored Dialight's concerns and requests that orders be manually reprioritized. In doing so, Sanmina deprived Dialight of the flexibility it purported to provide, and interfered with Dialight's ability to manage its customer relationships. In other words, Sanmina regularly failed to meet even the unreasonably protracted lead times its systems committed them to. In some instances, delivery dates were pushed back (or "decommitted") in excess of 10 times.

96. Sanmina also failed to uphold its express obligations to allow Dialight employees reasonable access to Sanmina facilities.

97. In addition to the above enumerated breaches, Sanmina acted in a manner that substantially and materially frustrated the purposes of the MSA, breaching the implied covenant of good faith and fair dealing by declining to bring its processes and protocols up to the "expert" standards it purported to hold, running up Dialight's bill for sub-component inventory rendered unusable solely by Sanmina's laggard production process, and otherwise acting with galling indifference to Dialight's good faith efforts to secure the benefit of its bargain.

98. Finally, Sanmina failed to deliver products free from workmanship defects (as evidenced by the epidemic defect of improperly crimped lanyards), utterly failed to comply with its obligations under MSA 23.8 when notified of the lanyard epidemic defect, and attempted to further defraud Dialight in its response to said notice of epidemic defect by claiming it had complied with Dialight's specifications when Dialight's own testing renders this claim demonstrably false.

99. These breaches all resulted in damage to Dialight, as they caused numerous customers to cancel their orders or decline to place new orders with Dialight.

100. Dialight tendered its termination notice to Sanmina on September 27, 2018. Sanmina to date has not contested Dialight's termination of the agreement for material breach.

**THIRD CAUSE OF ACTION**
**(Gross Negligence/Willful Misconduct)**

101. Independent of its contractual duties to Dialight, Sanmina also owed Dialight a duty to refrain from negligently or intentionally harming Dialight's business operations. Sanmina failed to discharge this duty.

102. Despite assuming manufacturing responsibility for Dialight, despite knowing that it lacked the ability to adequately take on this responsibility, and despite knowing that Dialight was depending on Sanmina to fill its customers' orders, Sanmina took no effective steps to improve its performance or to mitigate the consequences of its deficient performance. Instead, Sanmina, with its lack of expertise in high-mix low-volume contract manufacturing, oscillated between ignoring and denying the problem and actively elected to ignore the opportunity to cure the harm caused to Dialight when notified of potential rectifications by Dialight's expert engineers.

103. In addition, Sanmina knew that Dialight products are used and installed in high-risk industrial facilities and other hazardous environments, that Dialight products are, in substantial part, used for the safety and wellbeing of workers and members of the public who come into contact with such facilities and environments, and that the products it was manufacturing for Dialight would be deployed in such environments.

104. Sanmina further knew that industrial LED products such as Dialight's have the capacity to cause considerable harm to people, property, and the economic operations of industrial end-users if such products were to malfunction.

105. Sanmina's reckless indifference toward the safety of those who rely on Dialight's products, as demonstrated through the epidemic defect in safety lanyards and through various other instances of defective or inoperable product as described above, is apparent.

106. Sanmina plainly lacked all concern for Dialight's rights under the MSA or for the disastrous financial consequences certain to befall Dialight as a result of Sanmina's incompetence. Thus, Sanmina is liable not only for breaching its contractual obligations, but for negligently or willfully exacerbating the consequences of those breaches.

107. Sanmina's gross negligence in this regard has additionally subjected Dialight to further mitigation expense and reputational harm.

## PRAYER FOR RELIEF

WHEREFORE, Dialight prays for relief as follows:

A) Adjudge that Sanmina is liable for each cause of action stated herein;

B) For compensatory damages in an amount according to proof;

C) For punitive and exemplary damages in an amount according to proof;

D) Awarding Dialight the costs and disbursements of this action, and such other and further relief as the Court deems just and proper

## JURY DEMAND

Plaintiffs demand a trial before a jury on all of their claims.

Dated: New York, New York
December 20, 2019

Respectfully Submitted,

MINTZ LEVIN COHN FERRIS
GLOVSKY and POPEO, P.C

By:/s/ Scott A. Rader
Scott Rader, Esq.
666 Third Avenue
New York, NY 10017
Telephone: (212) 692-6751
E-mail: SARader@mintz.com

Daniel J. Herling, Esq. *(pro hac vice application forthcoming)*
44 Montgomery Street, 36th Floor
San Francisco, CA 94104
Telephone: (415) 432-6000
E-mail: DJHerling@mintz.com

*Attorneys for Plaintiff*